650 P.2d 1202

**STATE of Arizona, Appellee, Cross-Appellant,**

v.

**Scott Jay WILLIAMS, Appellant, Cross-Appellee.**

**No. 5039.**

Supreme Court of Arizona, En Banc.

June 24, 1982.

Rehearing Denied Sept. 14, 1982.

Robert K. Corbin, Atty. Gen., Phoenix, Stephen D. Neely, Pima County Atty. by D. Jesse Smith, Chief Deputy County Atty., Tucson, for appellee, cross-appellant.

DeConcini, McDonald, Brammer, Yetwin & Lacy by David C. Anson, Richard L. Barnes, Tucson, for appellant, cross-appellee.

FELDMAN, Justice.

Defendant, Scott Jay Williams, was convicted of first degree murder in violation of A.R.S. § 13–1105(A)(1). He was sentenced to life imprisonment without possibility of parole until 25 years have been served. He appeals from the judgment of conviction and the State cross-appeals. We have jurisdiction pursuant to A.R.S. §§ 13–4031 and 13–4035. Affirmed.

### FACTS

On the morning of November 29, 1978, the body of Penny Williams, defendant's ex-wife, was found in the front seat of her automobile near Pantano Wash in Tucson, Arizona. The words, "The Bitch," were printed in dust on the side of the car. Examination of the body at the scene revealed several superficial stab wounds to the left side of the neck, a laceration to the fore-

head and a large bruise to the base of the skull. In addition, the autopsy revealed a stab wound to the left temple, which had been concealed at the scene by the victim's blood-matted hair. Because this wound was both unique and hidden from view at the scene, the authorities withheld information concerning its location and existence from the press.

On December 17, 1978, the defendant's girlfriend, Rita Sipler,[1] contacted the police department and informed them that Scott Williams had confessed to her that he had murdered his former wife. She told the police the story that the defendant had related to her, including the location of the wound in the left temple. Sipler was questioned by the police and recordings of her statements were made. Based on this information, the defendant was arrested.

During questioning, a tape recording in which Rita Sipler related the defendant's confession was played to defendant. The defendant admitted making the statement to Ms. Sipler, but denied that it was true. When asked how he knew of the temple wound, defendant indicated he had read about it in the newspapers. Informed that this was not possible, defendant stated that one of the investigating officers had told him of the wound.[2]

At the preliminary hearing on January 30, 1979, Ms. Sipler testified in accordance with her prior statements to the police, and was cross-examined. As a result of this testimony, the defendant was held to answer before the superior court. Subsequently, Ms. Sipler admitted that part of her testimony at the January 30 hearing was perjured, and the first degree murder information against defendant was dis-missed without prejudice. The "perjured" testimony related principally to Ms. Sipler's personal knowledge of the disposition of the physical evidence, including the knife, brass knuckles, clothing and sneakers, but not to the detailed confession which defendant had given her and to which she had testified at the preliminary hearing. In early October 1979, a second preliminary hearing was held and Rita Sipler again testified and was cross-examined. Although she answered a question propounded by defense counsel by stating that she believed defendant's description of the murder was a fabrication, Sipler reiterated defendant's admission of the murder to her. Defendant once again was held to answer.

▪ The State based its case against the defendant mainly on the information supplied to it by Rita Sipler. She was, therefore, slated to be the State's chief witness against defendant at his trial. Before the trial commenced, however, Ms. Sipler and the defendant were married. Subsequently, when the case was called to trial, the defendant asserted the anti-marital fact privilege under A.R.S. § 13–4062(1),[3] thereby preventing Ms. Sipler from taking the stand. Unable to call Ms. Sipler, herself, to testify, the State introduced into evidence the testimony she had given at the preliminary hearings, plus the tapes of the statements she had made to the police, a diagram based on those statements, and excerpts from her personal diary.[4]

The defendant took the stand and testified on his own behalf. He admitted having made the "confession" which Ms. Sipler had related to the police, but stated that it had been a story which he had made up in

1. Ms. Sipler is now married to the defendant. However, most of the events set forth in this opinion occurred prior to Ms. Sipler's marriage to the defendant. For the purpose of this opinion, therefore, we will refer to her as Ms. Sipler.

2. At trial, both investigating officers testified that the subject of the temple wound was not discussed with defendant.

3. Section 13–4062(1) states:

A person shall not be examined as a witness in the following cases:
1. A husband for or against his wife without her consent, nor a wife for or against her husband without his consent . . . .

4. Rita Sipler was not married to the defendant at the time these statements were made, nor at the time of the preliminary hearing. Therefore, their admission into evidence is not precluded by the defendant's exercise of the anti-marital fact privilege under A.R.S. § 13–4062(1).

order to "turn Rita on" and make her love him more. In order to corroborate this contention, the defense offered in evidence the portions of Ms. Sipler's preliminary hearing testimony in which she had been allowed to give her opinion of the veracity of the defendant's confession. The prosecution objected to the admission of those portions of the preliminary hearing transcript on the ground of irrelevancy. The court overruled the objections, and Ms. Sipler's opinion that the confession had not been true was allowed in evidence.

## HEARSAY

On appeal, the defendant first argues that the tape-recorded statements, the diagram and the excerpts from the diary constituted hearsay and were therefore, inadmissible.[5]

### A. Tapes

■ Three tape-recorded conversations Rita Sipler had with police officers were introduced into evidence. Two of the conversations occurred on December 17, 1978, while the third conversation took place on January 5, 1979. The State first contends that the defendant has waived any error with respect to the second tape of December 17, 1978, and the tape of January 5, 1979, because defendant introduced these tapes into evidence at trial. We disagree.

Prior to trial, defendant made a motion in limine to preclude the State from introducing any evidence of Rita Sipler's tape recorded statements to police on the grounds that such statements were inadmissible hearsay. This motion was denied. This court has stated:

> Generally a motion in limine, made prior to trial, is sufficient to preserve the question of admissibility on appeal. . . . We

agree with the Ninth Circuit that a party should not necessarily lose his right to appeal a ruling because he alters his strategy in response to a trial court's finding against him. We hold that the defendant may raise on appeal the ruling of the trial judge denying defendant's motion to exclude evidence . . . .

*State v. Ellerson,* 125 Ariz. 249, 251, 609 P.2d 64, 66 (1980) (citations omitted).

In the present case, defendant altered his strategy by introducing the tape of January 5, 1979 in response to the trial court's ruling that the statements made by Rita Sipler to police officers were admissible. We therefore hold that defendant's general hearsay objection to all three tapes was adequately preserved for appeal.[6]

■ The tapes contained statements made by Ms. Sipler. These statements were not made in court and were offered to prove the truth of the matter asserted, i.e., that the defendant had told Ms. Sipler that he committed the murder and had provided her with a detailed description of how the murder was accomplished. As such, the contents of the tapes are clearly hearsay. *See* Rule 801(c), Arizona Rules of Evidence, 17A A.R.S. (hereinafter cited as "Evidence Rule ___"). Therefore, these statements were not admissible and it was error to admit them over objection. *See* Evidence Rule 802.

### B. Diagram

Ken Janes, an investigator for the Pima County Attorney's Office, testified to a conversation he had with Rita Sipler on May 29, 1979. Janes recounted this conversation to the jury and drew a diagram that was admitted into evidence over objection:

Q. [Y]ou indicated that there was a mannequin in the office where you talked to [Sipler]?

---

**5.** Defendant originally argued that the whole of Sipler's preliminary hearing testimony was inadmissible hearsay when used at his trial. However, he has since conceded that the testimony given at the preliminary hearing was generally admissible as "Prior Recorded Testimony" under Rule 19.3(c), Arizona Rules of Criminal Procedure, 17 A.R.S. Therefore, we no longer need address this issue.

**6.** While Rule 19.3(c), Arizona Rules of Criminal Procedure, 17 A.R.S., permits general use of prior recorded testimony, subsection (2) of that rule provides that such testimony is subject to the same objections as though the witness were testifying in person.

A. Yes, sir.

Q. ... do some kind of drawing as to the mannequin's head and upper body as best you can....

A. Yes, sir.

Q. All right. *And could you indicate [on the mannequin] where Rita showed you that Scott demonstrated [stabbing Penny]?*

A. [Rita] used her right hand and tapped three times in this area.

Q. Could you put some marks on there?

A. [She] [s]aid he had stabbed [Penny] on the right side of the neck and then placed the knife in her left temple and indicated in this manner [pointing to mannequin].

\* \* \* \* \* \*

Q. Did [Rita] indicate to you that Scott demonstrated this?

A. Yes, sir, she did.

(Emphasis added.)

■ The state contends that the diagram was non-hearsay in that it was a statement "made by the declarant," Janes, "while testifying at the trial." Evidence Rule 801(c). We disagree. Janes' demonstration on the diagram of Sipler's out-of-court gesture indicating the points at which the defendant had admitted striking Penny with the knife was simply a repetition of Sipler's "non-verbal conduct ... intended by [her] as an assertion" of what defendant had told her. Evidence Rule 801(A)(2). That gesture was, therefore, a "statement." [7] Thus, evidence of Ms. Sipler's non-verbal conduct which was admitted to prove the truth of the matter asserted was inadmissible hearsay and Janes' repetition of it in court did not transform it into non-hearsay.

■ Having concluded that the tapes and the diagram contained inadmissible hearsay statements, we must next determine whether their admission into evidence constituted harmless error. The test for determining harmless error is "whether there was reasonable probability ... that a verdict might have been different had the error not been committed." *State v. McVay,* 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980) (quoting *State v. Brady,* 105 Ariz. 190, 196, 461 P.2d 488, 494 (1969)). To put it differently, is there any reasonable doubt that the jury would have found the defendant guilty in the absence of this inadmissible hearsay? In this case, we believe that the jury would have found the defendant guilty even if the inadmissible evidence had not been admitted. First, all of the information conveyed by the statements in the tapes and by the diagram was admitted into evidence by other means. At trial, the State properly introduced into evidence the following excerpts from Ms. Sipler's preliminary hearing testimony:

Question: At a later time did you have another conversation concerning the death of Penny Williams?

Answer: Yes.

Question: When did that take place?

Answer: Between a week and two weeks after she was murdered.

Question: Where did that conversation take place?

Answer: At his house.

Question: And who was present?

Answer: Myself and Scott.

Question: Did he discuss with you that Penny Williams had come over on the night of the 28th?

Answer: Yes, he did.

Question: What did he tell you at that time?

Answer: He told me that they had some conversation over a television set.

Question: And what else did he tell you?

Answer: Well, he asked me if—well, why—well, I kept asking him, you know, if he killed her and things like that; and he replied, do I look like a murderer? Then he asked me, would you love me more if I told you I did it or would you love me less?

---

7. Evidence Rule 801(a) reads as follows:

Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

Question: And what did you tell him?

Answer: I told him, about the same.

Question: And what did he tell you?

Answer: Then he said that—that he did kill her.

Question: Did he explain what happened that particular evening of the death?

Answer: He said that they got in the car and went up 22nd Street to Pantano Wash, and that they parked along some road to the right off 22nd. He got out of the car, and she slid over to the driver's seat. And he hit her in the head.

Question: Did he indicate to you if he had anything with him that night?

Answer: Yes.

Question: What did he have?

Answer: A knife; brass knuckles and a glove or two.

Question: And you testified that she slid over to the driver's side and he told you he hit her. What did he tell you that he did then?

Answer: That he was there with the knife and that he reached in with a knife, and he cut her neck.

Question: Did he indicate how many times he stabbed her?

Answer: Three or four.

Question: And then what did he indicate he did?

Answer: *He stabbed her in the left side of her head.*

Question: *Did he indicate the left temple?*

Answer: *Yes.*

Question: Then what did he say he did?

Answer: He wiped off his knife and jogged home....

(Emphasis added.)

■ Thus, the information conveyed in Rita's taped statements and Janes' diagram illustrating Rita's gesture was cumulative to Rita's testimony at the trial. We have held that erroneous admission of evidence which was entirely cumulative constituted harmless error. *See State v. Wilson,* 113 Ariz. 363, 366, 555 P.2d 321, 324 (1976). *See also State v. Jones,* 123 Ariz. 373, 378, 599 P.2d 826, 837 (App.1979); *State v. Hughes,* 120 Ariz. 120, 128, 584 P.2d 584, 592 (App. 1978). *Compare State v. Ray,* 123 Ariz. 171, 173, 598 P.2d 990, 992 (1979) (holding inadmissible hearsay had resulted in prejudice because of the lack of any other evidence establishing the contents of the hearsay statements).

In addition, and perhaps more important to our finding of harmless error, is the fact that the contents of the hearsay evidence were not really in dispute. At the trial, the defendant, himself, admitted telling Rita he had murdered his ex-wife and admitted having given her a description of the murder substantially similar to that to which she had testified at the preliminary hearing, except that he contended that he had not told Ms. Sipler that he had stabbed the victim in the temple but had merely admitted to stabbing the victim in "the side of the head." However, the photographs in evidence show conclusively that the only stab wound to the "side of the head" was the stab wound in the left temple. Thus, it can fairly be said that the defendant did not in any significant manner contest Sipler's version of the conversation. Since the defendant, himself, had testified to substantially the same information as that contained in the hearsay statements, the issue which the statements tended to prove—that defendant had confessed and given a detailed description of the crime—was uncontested and the error was harmless. *See State v. Coey,* 82 Ariz. 133, 141–42, 309 P.2d 260, 265–66 (1957).

C. Diary—Part I

At trial, the State admitted various excerpts from Rita Sipler's diary. The defendant objects to admission of this evidence on hearsay grounds. The first statements to which the defendant objects are:

He confessed ... Scott killed Penny & has worse temper than I imagined ... I've been playing it as cool as possible. I have to know why and how. He said he's had it w/her. He pulled her car up to his house so no one would see them leaving together. The story about the t.v. was

fake. He drove to Pantano Wash & had his gloves on. He stopped car & got out. She slid into driver's seat & he took out his knuckles, knife, & put them on roof of car so she couldn't see what was happening. He punched her in the head (left side I think) & she fell over to right side of car & he bent thru window with knife & stabbed [?] side of neck as she threw her arms up to block him off & he slid knife around & repeated slices about 4 x & the finale was a thrust into her left temple. He rubbed everything off & got his stuff & shuffled his feet to prevent footprints & jogged back home. His tennis shoes were burnt along with his clothes. His knife was boiled & frozen.

 The defendant contends that these statements were inadmissible hearsay. He is correct. These extra-judicial assertions, offered to prove the truth of the statements, are hearsay. Evidence Rule 801(c). There are no exceptions to the hearsay rule under which Rita's written statements in her diary are admissible and it was, therefore, error for the trial judge to admit them. Here, again, however, we must note that the diary statement does not differ in any significant manner from Rita's preliminary hearing testimony in which she related defendant's confession and description of the killing. We recognize that repeated admission of inadmissible matter may so strengthen the weight of the original admissible version that what would have been cumulative becomes conclusive and highly prejudicial. Therefore, had the defendant denied the fact that he had made the confession, we might well have concluded that the various hearsay repetitions of Ms. Sipler's admissible testimony had caused prejudice. However, since the defendant's testimony substantially corroborated the contents of the admissible testimony, we find that the admission of this particular set of statements from the diary constitutes harmless error.[8]

### D. Diary—Part II

The second set of statements from the diary to which the defendant objects reads as follows:

Scott killed Penny & has worse temper than I imagined. He's been slapping boys in face & looking wild! I fear for myself & Jan so I'm splitting for Phoenix.... It's totally incredible. I'm tolerating him, but it won't be forever. It'll work out. It doesn't phase him in the least w/the exception of a slight pleasure. It's gross. I don't know what to do except leave.... If anything should happen to me, all information should be revealed to police cos I would never ever provoke him to kill me as Penny did. So if I die—he's sick. I'm not saying that he should be turned in cos it's me, if it's anyone else he should be kept away from society cos he'll do it again & again. If he stops with Penny I can almost understand although it's a sin & I would never—nor should anyone. It's just that he's suffered enough cos of her let alone go to jail the rest of his life for her.... told Scott I told detectives & he said it was all a lie to make me love him more.... 2-9-79-C.A. David Bergman [prosecuting attorney] Sorry couldn't help you any more with your case. All I can say is ... he did do it, but how can you prove it now?

The appellant objects to the admission of these excerpts both on the hearsay ground and because they are evidence of Rita Sipler's opinion, conclusions and belief regarding Scott Williams' truthfulness or guilt and, as such, are irrelevant and not admissible.

 The opinions of a witness regarding questions of truthfulness and guilt are gen-

---

8. In addition, when defendant was questioned by the police after his arrest, the tapes of Rita's statements to the police were played for him. After listening to the tapes, defendant admitted that he had told Rita the story related by Rita to the police. This admission was introduced in evidence under Evidence Rule 801(d)(2)(A).

The defendant cannot even argue that he was forced to take the stand by the admission of the hearsay and then forced to admit the "confession" to Sipler. The making of that "confession" was not in controversy because of defendant's admissions before trial.

erally inadmissible for a variety of reasons. One reason is that Rule of Evidence 701, codifying and, hopefully, bringing reason to a morass of prior law, forbids lay testimony "in the form of opinions or inferences" except with respect to those which are "(a) rationally based on the perception of the witness *and* (b) helpful to a clear understanding of his testimony . . . ." (Emphasis added.) It had generally been the rule also that testimony on the ultimate issues in the case was inadmissible. *See* 1 M. Udall & J. Livermore Law of Evidence § 26, at 46 (2d ed. 1982). While Rule of Evidence 704 now provides that "otherwise admissible evidence" is not objectionable simply because it "embraces" the ultimate issue, the comment to that rule sets forth the reason for the general inadmissibility of testimony tending to establish the opinion of the witness as to the defendant's guilt or innocence, truthfulness or untruthfulness. The comment states:

> Some opinions on ultimate issues will be rejected as failing to meet the requirements that they assist the trier of fact to understand the evidence or to determine a fact in issue. *Witnesses are not permitted as experts on how juries should decide cases.* [Emphasis added.]

Thus, generally a witness may not indicate his belief in defendant's guilt. *See Arpan v. United States,* 260 F.2d 649, 657–58 (8th Cir. 1958). Ms. Sipler's diary statements show her belief in the truth or falsity of defendant's confession and, thus, of his guilt or innocence and would therefore be irrelevant and inadmissible. *Arpan v. United States, supra.* Also, the diary entry would ordinarily be inadmissible hearsay because it was a statement made other than while testifying. Evidence Rule 801(c).

Here, however, the diary entry was offered under rather unusual circumstances. Williams' defense at trial centered around the contention that he had lied when he told Rita he had killed Penny Williams. To give substance to that contention and to his testimony on that point, defendant offered in evidence Ms. Sipler's preliminary hearing testimony that she did not believe that the defendant had killed his wife, and did believe that the entire story he had told her had been made up. This evidence was admitted over the State's objections on relevancy and hearsay. The diary entry in question was offered after the defense offer regarding Rita's lack of belief. The entry shows Rita's state of mind, i.e., her belief or disbelief of defendant's "confession." The diary clearly justifies an inference that Ms. Sipler gave more credence to defendant's confession than was indicated in her preliminary hearing testimony and was, therefore, relevant to contradict her testimony, already in evidence, that she believed defendant had lied in "confessing" to her. *See Ewing v. United States,* 135 F.2d 633, 639–40 (D.C.Cir.1942), *cert. denied,* 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943).

Further, when offered for this purpose, the diary entry is not inadmissible hearsay. In order to constitute hearsay, a statement must be offered to prove the truth of the matter asserted. Evidence Rule 801(c). Here, the diary entry was not offered to prove the truth of the matters asserted—that the defendant killed Penny, that Rita feared him, that he might kill her, that he was provoked and shouldn't go to jail, etc.—but to show inferentially that Ms. Sipler believed that the defendant killed Penny. Declarations offered as circumstantial evidence of the declarant's state of mind are not hearsay at all because they are not offered to prove the truth of the declaration. Evidence Rule 801(c); M. Udall & J. Livermore, Law of Evidence § 122 at 242 (2d ed. 1982). *See State v. Ramirez,* 116 Ariz. 259, 264–65, 569 P.2d 201, 206–07 (1977). *Compare,* M. Udall & J. Livermore, Law of Evidence § 128 at 274 (2d ed. 1982) (dealing with statements which as direct assertions of the declarant's state of mind constitute hearsay but are nonetheless admissible under the exception to the hearsay rule set forth in Evidence Rule 803(3)).

Thus, while the diary entry tending to prove Rita's belief in defendant's confession and consequent conclusion that he was

guilty would be irrelevant, highly prejudicial and inadmissible, that entry became important to rebut defendant's evidence that Rita had known the "confession" was a fabrication. Defendant had put Rita's belief in issue and Rita's diary statement on that point then became "of consequence to the determination" of that issue. It was therefore relevant. Evidence Rule 401. When the entry was used for that purpose, it was used as a statement showing Rita's state of mind and was not hearsay and therefore admissible.

■ We conclude, therefore, that although Sipler's taped statements, the first part of Sipler's diary entry and Janes' diagram were all hearsay and were erroneously admitted, no prejudice occurred because the evidence was merely cumulative to other testimony and tended, at worst, to establish a fact—the detailed confession to Sipler—which defendant admitted. Under the facts of this case, the second diary entry was relevant and also admissible on the issue of Rita's belief.

## ALLEGED COMMENT ON THE EXERCISE OF THE PRIVILEGE

■ The defendant next contends that the trial court erred by permitting the prosecutor to ask defendant's mother whether she knew if her son had married Rita Sipler. Defendant contends that this question was inconsistent with his exercise of the anti-marital fact privilege. We disagree. In support of this proposition, defendant relies upon this court's decision in *State v. Holsinger*, 124 Ariz. 18, 601 P.2d 1054 (1979). In that case, we held that:

> [a] defendant's marital privilege is violated when a prosecutor comments [in argument] *on the defense's failure to call defendant's spouse as a witness:* "[T]he established principle which permits an inference that the excluded testimony would be unfavorable to the party who suppressed it ought to yield, as being inconsistent with the full exercise of the [marital] privilege."

*State v. Holsinger,* 124 Ariz. at 24, 601 P.2d at 1060 (citation omitted) (emphasis added).

In this case, however, the prosecutor did not seek to admit evidence of the marital relationship so that he could later comment on the defendant's failure to call Rita Sipler to the stand. Instead, he sought to establish the existence of the marital relationship for other purposes. Rita Sipler, through her preliminary hearing testimony was the State's chief witness against the defendant. Throughout the trial, the defendant sought to impeach her credibility by showing that she was an alcoholic and a liar. The State then sought to rehabilitate its witness by introducing evidence of the marital relationship. To support its offer, the State argued that the evidence of marriage warranted an inference that Rita's character was not so bad as defendant claimed at trial. The evidence was admissible for this purpose, *see* Rule of Evidence 806. Therefore, the trial court did not commit reversible error by allowing the prosecutor to prove the existence of the marital relationship. If anything, the evidence tended to explain the State's failure to call Sipler, its most important witness. This is not inconsistent with the purpose of the rule prohibiting comment on defendant's failure to call his wife. That rule exists to protect the privilege by prohibiting an adverse inference from the exercise of that privilege. Here there was no comment or mention of the exercise of the privilege or of defendant's failure to call his spouse. There was only a mention of marriage—which served, perhaps, to explain the State's failure to call Ms. Sipler.

■ Nor do we find that the prosecutor in his closing argument impermissibly commented on the defendant's exercise of the anti-marital fact privilege. It is true, as the defendant contends, that the prosecutor, in closing, stated: "You're sitting here with this kind of malarkey testimony between Rita and Scott. They put this together, so I don't have any testimony." Read in context, it is clear that this statement by the prosecutor is not a reference to the anti-marital fact privilege, but is, instead, a comment on the fact that Rita,

after telling the police that Scott Williams killed his wife, substantially recanted part of that testimony.[9]

## THREATS MADE BY THIRD PARTY

Finally, the defendant contends that the trial court erred by refusing to admit evidence of threats allegedly made to Penny Williams by a high school girl from Globe. At the pretrial hearing, three witnesses, who were high school classmates of the girl, testified to the fact that Penny Williams had received threats prior to her death.

The victim's brother stated that approximately three weeks before the murder he had overheard the girl say that "[s]he was going to get even with Penny for taking Robby [the girl's boyfriend] away from her." The brother also testified that he had seen a letter in the girl's purse to the same effect and that Penny Williams, who resided in Tucson, had told him by phone several days prior to the murder that she had received threats. Specifically, the brother testified that the victim told him that she found an anonymous note pinned to the slashed throat of her roommate's dog, warning that the same fate awaited her if she continued to see Robby.

Paul Heatherly testified that Penny Williams had told him of the dog incident as well, and that Penny had stated that she had found another anonymous note on her windshield after her tires had been slashed in Tucson and that she was going to borrow a gun. The third schoolboy from Globe, Brett Dalmolin, corroborated the testimony concerning the existence of the "get even"

letter and Penny Williams' statements relative to the dog and the tires.

After hearing the above testimony outside the presence of the jury, the trial court held that evidence concerning the threats would not be admitted. He based his decision for this ruling on Rule of Evidence 403, which allows the trial judge to exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The weighing and balancing under Rule 403 is within the discretion of the trial court and will not be disturbed on appeal unless it has been clearly abused. *State v. Clark*, 126 Ariz. 428, 434, 616 P.2d 888, 894 (1980).

We find that the judge did not abuse his discretion in refusing to admit evidence of the threats. "The rule is that threats by a third person against a victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." *State v. Schmid*, 109 Ariz. 349, 356, 509 P.2d 619, 626 (1973) (citations omitted). In this case, the evidence did not connect the Globe girl to the commission of the murder. While the defense offered testimony that Penny Williams made statements that both her car tires and her roommate's dog's throat had been slashed, there was no corroboration since the defense failed to offer any evidence that these incidents had actually occurred. In fact, the only definitive evidence was that the dog incident had not

9. At the preliminary hearing on January 30, 1979, Ms. Sipler testified that the defendant had told her that he murdered his wife and described to her how the murder was accomplished. She also testified, however, that the defendant had later told her that he had fabricated the entire story. Subsequently, Ms. Sipler testified that the defendant had never told her that it was all a lie but that she and the defendant had gotten together and decided that she should go to the police and tell them that the defendant had told her that his confession

was a lie. Then, in early October 1979, at the second preliminary hearing, Ms. Sipler testified that she had lied when she had testified that the defendant had never told her that the entire story was fabricated. This portion of the preliminary hearing testimony was admitted into evidence and was thus subject to comment by the prosecutor. As there was evidence admitted at trial showing that Rita did, indeed, change her story, the prosecutor's statement was within the scope of permissible argument

occurred.[10] In addition, the prosecutor was prepared to prove that Penny Williams had written the threatening notes herself. Thus, the testimony simply afforded a vague ground of suspicion against the Globe girl. As such, it was within the sound discretion of the trial judge to refuse to admit such evidence. *See State v. Renteria,* 21 Ariz.App. 403, 404, 520 P.2d 316, 317 (1974).

This holding, however, does not end our discussion. The defendant argues that even if the evidence concerning the threats in general was properly excluded, the testimony of Paul Heatherly that Penny Williams told him that she was going to borrow a gun from the defendant was admissible under this court's holding in *State v. Gause,* 107 Ariz. 491, 489 P.2d 830 (1971), *vacated on other grounds,* 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972), a case which dealt with the victim's fear of the defendant. In *Gause,* 107 Ariz. at 495, 489 P.2d 834, we held that "expressions of fear by a murder victim, though they may be hearsay, are relevant, have probative value on the issue of identity, and when in human experience they have sufficient reliability, they should be admitted into evidence." While we recognize that one could argue, as the defendant does, that the principle of *Gause* is equally applicable to cases where the defendant seeks to admit evidence that the victim was not afraid of the defendant, we need not reach that question. In this case, the trial court did not exclude the evidence on hearsay grounds. Instead, it relied upon its discretion to exclude evidence under Rule 403. Given the circumstances of this case, we do not believe that exclusion of Penny Williams' statement was an abuse of discretion. First, there was other evidence introduced at trial to show that Penny Williams was not afraid of the defendant. Second, in order to lay a foundation for its admission, the defense would have had to admit considerable evidence concerning the threats on Penny Williams' life. Thus, the trial court was justified in excluding evidence of the statement on the grounds that it was cumulative and because it may have led to confusion of the issues. *See* Evidence Rule 403.

In conclusion, we find that the various assertions of error made by the defendant do not warrant reversal. Accordingly, we affirm his conviction.

### STATE'S CROSS–APPEAL

At trial, the defendant invoked the marital privilege. On cross-appeal, the State contends that the privilege does not apply in this case since Rita Sipler was not married to the defendant at the time he confided in her that he had murdered his wife. We agree in principle that the privilege should not apply in this case, but are unable to so hold.

A.R.S. § 13–4062 states:

A person shall not be examined as a witness in the following cases.

1. A husband for or against his wife without her consent, nor a wife for or against her husband without his consent. . . .

The defendant and Rita Sipler were married *at the time of the trial.* Thus, under

---

and did not constitute error. *See State v. Freeman,* 114 Ariz. 32, 45, 559 P.2d 152, 165 (1976).

**10.** Robin West, the roommate, testified as follows:

Q. Were you the roommate of Penny Williams previously to November 28, 1978?
A. Yes.
Q. How long had you been a roommate?
A. She moved into my house the last of October the same year.
Q. Did you have any discussions with her, did she ever discuss with you any threats made upon her life?
A. No.

Q. Did you have any dogs?
A. Yes, two dogs at the time.
Q. During the period of time that Penny Williams was your roommate, did anything ever happen to these dogs?
A. No.
Q. There was no slashing of any of the dogs' throats or anything like that?
A. No.
Q. Did Penny Williams during the time that you spent with her or live with her, did she appear frightened at any time?
A. No. We talked several times. She never indicated anything like that. . . .

§ 13–4062, the defendant had a right to prevent his wife from testifying against him. Because of this, we have no choice but to hold that the trial court did not err by refusing to compel the defendant's wife to testify.

■ The choice of whether the marital privilege should be recognized and under what circumstances is not only an evidentiary question but involves a determination of the rights and status which flow from the institution of marriage. *See State v. Watkins,* 126 Ariz. 293, 298, 614 P.2d 835, 840 (1980). Nor is this rule one which was made by the courts and which they are, therefore, free to rescind when they conclude that it no longer serves its purpose. *Cf. Fernandez v. Romo,* 132 Ariz. 447, 646 P.2d 878 (1982). Thus, the policy determination involving abrogation of the rule is an appropriate subject for legislative determination. In Arizona, our legislature has chosen to retain the marital privilege despite this court's strong disapproval of the privilege in *State v. Whitaker,* 112 Ariz. 537, 540, 544 P.2d 219, 222 (1975). By doing so, it has made it clear that it places paramount importance on the marital relationship and believes the privilege is necessary to protect that relationship from the strain which would be placed upon it if spouses were allowed to testify against each other.

With due respect, we still question the wisdom of this statute. One has only to look at the facts of this case to realize why we do so. While it is true that Rita Sipler and the defendant were married, there is little evidence to show that this marriage relationship ever existed except on paper. Aside from this, however, even if it could be shown that the defendant and his wife were happily married, we cannot look favorably upon a rule of law which permits the defendant to keep the State's chief and perhaps only witness from testifying against him. As Wigmore, in his treatise on evidence, states: "[T]he peace of families does not essentially depend on this immunity

from compulsory testimony, and, [even if it did], that result [should not be] allowed to stand in the way of doing justice to others." *See* 8 Wigmore, Evidence § 2228, at 216 (McNaughton rev. 1961). Nevertheless, we continue to enforce the mandate of the legislature and hold that the trial court did not err in recognizing the privilege.

We are also constrained to point out that in its present form the statute encourages marriages made for no other reason than to provide a witness with immunity[11] from giving testimony necessary to accomplish the aims of justice. The state's policy should not be to condone a rush to marriage before trial as a means of conferring testimonial immunity. If it is, perhaps, overly sentimental to wish that marriage should be made in heaven, it is foolish to encourage it to be made on the courthouse steps.

HOLOHAN, C. J., GORDON, V. C. J., and HAYS, J., concur.

CAMERON, Justice, dissenting.

I regret that I must dissent. I do so for two reasons. First, I do not agree that the error in admission of the hearsay evidence is harmless, and, second, I do not believe the marital privilege applies to the facts of this case.

### HARMLESS ERROR

I agree with the majority that the trial court committed error in admitting, over defendant's objection, certain out-of-court statements and hearsay material. I cannot agree, however, with the majority's conclusion that the admission of the diagram was harmless error. The majority states:

> "* * * The test for determining harmless error is 'whether there was reasonable probability . . . that a verdict might have been different had the error not been committed.' (citations omitted) To put it differently, would the jury have found the defendant guilty in the absence

---

11. The record does not contain facts to support a *finding* that the marriage was a sham, undertaken for no reason other than to disqualify the witness. *Cf. Lutwak v. United States,* 344 U.S.

604, 615, 73 S.Ct. 481, 488, 97 L.Ed. 593, 602 (1953). Therefore, we do not decide the applicability of A.R.S. § 13–4062 to "sham marriages."

of this inadmissible hearsay? In this case, we believe that the jury would have found the defendant guilty even if the inadmissible evidence had not been admitted. * * * ''

It is agreed that the error must be harmless "beyond a reasonable doubt." *State v. McVay*, 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). I do not believe, however, that in this case we can, on appeal, state that the admitted errors were harmless beyond a reasonable doubt. *McVay, Chapman, Harrington,* supra. I therefore believe the harmless error doctrine has been misapplied.

## MARITAL PRIVILEGE

At trial, defendant asserted the marital privilege, and the court, over the State's objections, allowed the privilege and refused to compel the defendant's wife to testify.

Our statute reads:

"A person shall not be examined as a witness in the following cases:

"1. *A husband for or against his wife without her consent, nor a wife for or against her husband without his consent,* nor can either, during the marriage or afterwards, be, without consent of the other, examined as to any communication made by one to the other during the marriage. * * * '' A.R.S. § 13–4062(1). (emphasis added)

The Arizona statute is a codification of two common law marital privileges better known as the anti-marital fact privilege and the confidential communication privilege. The two privileges are to be distinguished in that the former goes to the question of competency, and, if properly invoked, prevents the witness-spouse from testifying on any matter at trial. The confidential communications privilege relates only to communications that are made during the marriage and intended to be confidential. *State v. Whitaker,* 112 Ariz. 537, 544 P.2d 219 (1975). See also Comment, The Husband-Wife Evidentiary Privilege:

Is Marriage Really Necessary?, 1977 Ariz. St.L.J. 411. Since the statements concerning murder were made prior to the marriage, the defendant cannot claim that his communication with Rita Sipler is within the scope of the confidential communications privilege. Williams' claim of privilege, then, is necessarily one of the anti-marital fact privilege.

Since their inception at early common law, the marriage privilege in general and the anti-marital fact privilege in particular have been much criticized by the courts and scholars. The United States Supreme Court has stated:

"The *Hawkins* rule stands in marked contrast to these three privileges. Its protection is not limited to confidential communications, rather it permits an accused to exclude all adverse spousal testimony. As Jeremy Bentham observed more than a century and a half ago, such a privilege goes far beyond making 'every man's house his castle,' and permits a person to convert his house into 'a den of thieves.' 5 Rationale of Judicial Evidence 340 (1827). It 'secures, to every man, one safe and unquestionable and [ever] ready accomplice for every imaginable crime.' (*Id.* at 338).

"The ancient foundations for so sweeping a privilege have long since disappeared." *Trammel v. United States,* 445 U.S. 40, 51–52, 100 S.Ct. 906, 913, 63 L.Ed. 186, 195–96 (1980). See also J. Wigmore, Evidence, § 2228 at p. 221 (McNaughton Rev. 1961); McCormick, Evidence, § 66 at 145–46 (2d ed 1972).

Only twenty-four states still retain vestiges of the privilege. See *Trammel v. United States,* Id. at 48, n. 9, 100 S.Ct. at 911–12, n. 9, 63 L.Ed.2d at 193–94, n. 9. This court has also expressed its disapproval of the privilege in *State v. Whitaker,* supra, where we characterized the privilege as the "merest anachronism in legal theory and an indefensible obstruction to truth * * *." Id. at 540, 544 P.2d at 222 (quoting 8 J. Wigmore, Evidence, § 2228, at p. 221 (McNaughton Rev. 1961). Nevertheless, we continue to recognize the legislative man-

date. See also, *State v. Watkins,* 126 Ariz. 293, 614 P.2d 835 (1980). As an example of the problem that can be created by strict adherence to the anti-marital fact privilege, see *Vance v. Rice,* 524 F.Supp. 1297 (1981), where the District Court for the Southern District of Iowa upheld a jailer's refusal to allow a defendant and a material witness, pregnant by the defendant, to be married because of the fear that the defendant would then invoke Iowa's marital immunity statute at a later trial.

I do not believe that the legislature intended the anti-marital fact privilege to be invoked concerning a crime committed by the defendant prior to the marriage. In this position I am not without tacit support from authority in a closely related case. *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed.2d 593 (1953).

In *Lutwak,* supra, the United States Supreme Court disallowed marital privilege where the defendants, who had entered into a "sham" marriage for the purpose of evading federal immigration laws, sought to evoke the privilege and prevent their spouses from testifying against them. The court held that:

> "[w]hen the good faith of the marital relation is pertinent and it is made to appear to the trial court, as it was here, that the relationship was entered into with no intention of the parties to live together as husband and wife but only for the purpose of using the marriage ceremony in a scheme to defraud, the ostensible spouses are competent to testify against each other.
>
> \*　\*　\*　\*　\*　\*
>
> "* * * We therefore hold that in the circumstances of this case, the common-law rule prohibiting antispousal testimony has no application." 344 U.S. at 614–15, 73 S.Ct. at 488, 97 L.Ed.2d 602.

In reaching its conclusion, the *Lutwak* court took judicial notice that the reason usually given for the disqualification of spouses as witnesses against each other is to protect the sanctity of the marital relationship. See J. Wigmore, supra, § 2228; *State v. Walker,* 112 Ariz. at 540, 544 P.2d at 222.

The *Lutwak* court focused on the purpose of the marriage rather than on its validity. I do not base my opinion, however, on the fact that this could be a sham marriage. I do not know whether one or both parties entered into this marriage for legitimate reasons or not. I do not believe that the court should be required to define the motives behind the marriage.

"Such a determination would necessitate a case by case qualitative and quantitative analysis on such factors as intimacy, voluntary commitment, stability and psychological involvement." *State v. Watkins,* 126 Ariz. at 298, 614 P.2d at 840 (1980).

I do not believe that the legislature intended the statute to extend to illegal matters which occurred prior to the marriage. As to those matters, I believe the spouse is competent to testify. I would hold that the statute does not apply as to the crimes committed before marriage and for which the defendant is being tried, and that a spouse may be called for the limited purpose of testimony concerning that crime.