NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

J.V., *Appellant.*

No. 1 CA-CR 16-0526
FILED 8-10-2017

Appeal from the Superior Court in Maricopa County
No.  CR 2014-002XXX-XXX
The Honorable Jay R. Adleman, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Kevin D. Heade
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Randall M. Howe joined.

---

**C A M P B E L L**, Judge:

**¶1**        J.V. appeals his convictions and sentences for two counts of promoting prison contraband, class two felonies under Arizona Revised Statutes ("A.R.S.") section 13-2505. He raises two issues: first, the trial court erred by denying his request for a jury instruction on the justification defense of necessity; second, the trial court erred by permitting the State's expert to opine on an ultimate issue of whether the items he possessed were deadly weapons. We disagree and affirm.

### FACTS AND PROCEDURAL BACKGROUND[1]

**¶2**        J.V. was serving a prison sentence in the Department of Corrections. On March 26, 2014, prison officials found two prison-made weapons, known as "shanks," concealed under his clothing. In September 2014, a grand jury indicted J.V. with two counts of promoting prison contraband, one count for each item.

**¶3**        Before trial, J.V. notified the trial court of his intention to assert the justification defense of necessity. The State moved to preclude the necessity defense, arguing J.V. was neither faced with an imminent threat nor lacking a reasonable alternative course of action, as required to justify his conduct under the necessity defense. The trial court held an evidentiary hearing to resolve the issue.

**¶4**        At the hearing, J.V. testified that he began receiving threats from multiple prison inmates in January 2014. J.V. believed he was receiving these threats because of a May 2013 incident in which he provided prison officials with information about contraband in exchange for placement in protective custody.

---

[1]        When a trial court refuses a jury instruction, "we view the evidence on appeal in the light most favorable to the proponent of the instruction." *State v. Almeida*, 238 Ariz. 77, 78-79, ¶ 2 (App. 2015) (citation omitted).

¶5        J.V. claimed to have submitted an unspecified number of inmate letters to prison officials explaining he was being threatened. Early in March 2014, he also indicated he had contacted his mother requesting she speak with the warden about his concerns. As of the date of the incident, he had not received any response about the threats from prison officials.

¶6        As further evidence of the threatening behavior, J.V. testified that sometime around March 2014, mediation and informal complaint resolution documents were submitted to prison officials by another inmate. These documents both appeared to bear J.V.'s signature, but J.V. neither wrote nor signed either of the documents. J.V. explained that he suspected the request was an effort by the inmate to be moved to the same housing area as J.V. He was fearful of being housed with this inmate because J.V. was involved in the prison investigation of the murder of the inmate's son.

¶7        On the morning of March 26, 2014, J.V. testified, another inmate told him that "just because [you're] where [you're] at doesn't mean [you] can't be touched." Fearing that he might be targeted by a "hitman" and not wanting to be labeled a "snitch," J.V. did not inform prison officials of this threat. He instead tied two shanks to his underwear with a string. The shanks were detected by the metal detector through which he passed on his way to lunch. As a result, prison officials took J.V. back to his cell, searched him, and found the shanks.

¶8        The trial court granted the State's motion to preclude the necessity defense, finding that the threat to J.V. was not imminent and that he had other reasonable legal alternatives to carrying contraband. Consequently, at trial, J.V. was precluded from presenting witnesses to testify regarding the necessity defense and the jury was not instructed on the necessity defense.

¶9        The jury found J.V. guilty on both counts of promoting prison contraband. The trial court sentenced J.V. to fourteen years in the Department of Corrections. J.V. timely filed a notice of appeal.

## DISCUSSION

### I.        The Justification Defense of Necessity

¶10        J.V. argues that the trial court abused its discretion by denying his request for a jury instruction on the justification defense of necessity because he presented the slightest evidence supporting the defense. We disagree.

**¶11** A party is entitled to a jury instruction on any theory reasonably supported by the evidence. *State v. Rodriguez*, 192 Ariz. 58, 61, ¶ 16 (1998). The "slightest evidence" is sufficient to support giving the instruction. *State v. Almeida*, 238 Ariz. 77, 79, ¶ 9 (App. 2015); *see also State v. Johnson*, 108 Ariz. 42, 43 (1972) (instruction required if the evidence "in the slightest degree tends to" show justification) (citation omitted). This court does not weigh the evidence or resolve conflicts in it; rather, this court decides whether the record provides evidence upon which the jury could rationally sustain the defense. *Almeida*, 238 Ariz. at 80, ¶ 9. "The slightest *evidence*—not merely an inference making an argument possible—is required because speculation cannot substitute for evidence." *State v. Vassell,* 238 Ariz. 281, 284, ¶ 9 (App. 2015) (citations omitted). We generally review the trial court's denial of a jury instruction for an abuse of discretion, but independently assess whether the evidence supported a justification instruction because that is a question of law that involves no discretionary factual determination. *Almeida*, 238 Ariz. at 80, ¶ 9.

**¶12** The defense of necessity is a justification defense. A.R.S. § 13-417(A). Conduct that would otherwise constitute an offense is justified by necessity "if a reasonable person was compelled to engage in the proscribed conduct and the person had no reasonable alternative to avoid imminent public or private injury greater than the injury that might reasonably result from the person's own conduct." A.R.S. § 13-417(A).[2]

**¶13** At the evidentiary hearing, J.V. failed to present even the slightest evidence supporting the defense of necessity. Although J.V. presented evidence suggesting he had reason to fear he may *at some point* be the target of an assault, he presented no evidence that an attempted attack or injury was imminent. "Imminent" means "ready to take place," "hanging threateningly over one's head." Merriam-Webster's Collegiate Dictionary 621 (11th ed. 2014). J.V. testified that he received a verbal threat on the morning of March 26—the day he was found with the shanks—but this indefinite threat named neither a time nor place of any potentially forthcoming assault. J.V. also testified that he began receiving similar threats as early as January, but presented no evidence that the verbal threat of March 26 gave him any reason to believe an assault was suddenly any more imminent than in the preceding months. Rather, J.V. testified that "when I was going to the chow hall, yes, there was a strong possibility that

---

[2] The necessity defense is available in any prosecution for an offense pursuant to Title 13. *See* A.R.S. § 13-401(B); *State v. Fell*, 203 Ariz. 186, 187, ¶ 1 (App. 2002) (the necessity defense does not apply to criminal offenses defined outside Title 13).

I would be assaulted, but I did not know for sure." J.V. himself was uncertain about the precise nature of the verbal threat and did not know if or when any assault would be carried out.

¶14        Additionally, J.V. had reasonable, legal alternatives to violating the law prohibiting the possession of contraband in prison. J.V. testified that his goal in carrying the shanks was to either "trigger the metal detector," because he knew getting found with weapons was a way to get placed in protective custody, or, "wors[t] case scenario, I would have had to use it to defend myself." However, J.V. had previously worked with prison officials to secure placement in protective custody. He explained his understanding of the prison protocol when an inmate informs a correctional officer, face-to-face, of a threat from another inmate: "Usually they'll place you in handcuffs and put you in a secured area and interview you and, depending on their investigation, they'll either put you in a detention unit or isolation area." He further testified to successfully using this process before: After telling prison officials he was being threatened for a drug debt in a prior instance, "[t]hey placed me in a detention unit awaiting the process, the protective segregation process, and they placed those inmates on my do-not-house list."

¶15        In this instance, J.V. did not attempt to speak directly with prison officials concerning the renewed threats when they began in January. He did not attempt to speak directly to an officer at any point in the intervening months, nor on the morning of the March 26 incident, after he received the latest threat. Rather, J.V. pursued the unnecessary and unreasonable option of obtaining and carrying dangerous prison contraband. There was no evidence that the shanks only came into his possession *after* the specific threat preceding the incident. He voluntarily sought to be detained for a violation of prison rules instead of simply informing the prison staff of the threatening situation because he did not want to run the speculative and unquantifiable risk of yet again being labeled a "snitch." Speaking directly to an officer about the threat on March 26 was a legal alternative to carrying shanks.

¶16        J.V. further argues the trial court improperly considered public policy implications in precluding J.V. from presenting the necessity defense. Again, we disagree. The trial court did not improperly craft its own public policy rationale in denying the defense instruction when it stated, "The alternative to being a snitch is not to carry shanks." On the contrary, the trial court's reasoning conforms with the prescriptions of the necessity-defense statute: The "injury that might reasonably result from," carrying prison contraband includes not only serious harm to J.V. himself, but

serious harm to other inmates and correctional officers. A.R.S. § 13- 417(A). The potential injury to the general prison community was "greater than" the risk of injury a reasonable person would perceive from the indefinite threat J.V. received. *Id*. His actions were not motivated by necessity as he claims, but by a desire to receive protection from prison officials without having to disclose the reason in front of his fellow inmates. As the trial court put it, there was a "cost-benefit analysis that [J.V.] was going through," but the results of that analysis were not enough to compel a reasonable person to engage in the proscribed conduct of possessing contraband.

¶17        Accordingly, J.V. did not present the slightest evidence on which the jury could rationally sustain the justification defense of necessity. We find no abuse of discretion in the trial court's decision not to provide the jury with the defense instruction.

## II.        Opinion Testimony on an Ultimate Issue

¶18        J.V. argues that the trial court committed reversible error by allowing the State's prison investigation witness, James Currier, to opine on the "ultimate issue" of whether the shanks were deadly weapons or dangerous instruments. We disagree. Even assuming Currier's testimony was admitted in error, any error was harmless.

¶19        "We review evidentiary rulings on the admissibility of expert opinions for abuse of discretion." *State v. Chappell*, 225 Ariz. 229, 235, ¶ 16 (2010) (citation omitted). Arizona Rule of Evidence 704 allows "expert testimony that embraces an ultimate issue to be decided by the trier of fact, as long as the opinion assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Chappell*, 225 Ariz. at 235-236, ¶ 17; *see also* Ariz. R. Evid. 704 cmt. to 1977 Rule.

¶20        Under A.R.S. § 13-2505(A)(3), a person commits promoting prison contraband by "possessing contraband while being confined" in a correctional facility. "Contraband" includes a "deadly weapon" or a "dangerous instrument." A.R.S. § 13-2501(1). A "'deadly weapon' means anything designed for lethal use." A.R.S. § 13-105(15). A "dangerous instrument" means anything that, under the circumstances in which it is used, is readily capable of causing death or serious physical injury. A.R.S. § 13-105(12).

¶21        At trial, the State called Currier as both a fact and expert witness. J.V. did not object to Currier's qualifications. J.V. did object to Currier's statement that the weapons found on J.V. "are designed to kill,"

but the court allowed the testimony. Currier further testified that, "by design, they are fashioned—one of which is similar to an ice pick, another one is similar to that of a double-edged weapon. . . . [W]eapons such as this can inflict death and they disrupt the ordinary operation of an institution."

¶22　　During his own testimony, J.V. acknowledged that, to get himself moved to maximum security, he knew he would need to be discovered with shanks that amount to a deadly weapon or dangerous instrument. He admitted the shanks he possessed "could kill."

¶23　　On appeal, J.V. only challenges Currier's testimony concerning the deadly nature of the shanks found on J.V. Currier was a testifying expert who can opine about the nature of things within his field of expertise, even if that information embraces an ultimate issue within the purview of the jury. Additionally, his testimony was cumulative to J.V.'s own testimony that the shanks found on J.V. were capable of inflicting death. Therefore, any possible error the trial court committed in admitting Currier's testimony was harmless. *See State v. Williams*, 133 Ariz. 220, 226 (1982) (erroneous admission of evidence that is cumulative to other evidence admitted at trial constitutes harmless error) (citations omitted).

## CONCLUSION

¶24　　For the foregoing reasons, we affirm J.V.'s convictions and sentences.

