584 P.2d 584

The STATE of Arizona, Appellee,

v.

Carlos Billy HUGHES, Appellant.

No. 2 CA–CR 1298.

Court of Appeals of Arizona,
Division 2.

June 27, 1978.

Rehearing Denied Aug. 8, 1978.

Review Denied Sept. 14, 1978.

John A. LaSota, Jr., Atty. Gen., by William J. Schafer, III, and Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

John M. Neis, Pima County Public Defender, by Michael P. Roca, Asst. Public Defender, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant was convicted of three counts of forgery with prior convictions and sentenced to concurrent terms in the Arizona State Prison of not less than 10 nor more than 14 years. The record discloses the following facts.

Mr. and Mrs. Walter Clapp resided in Tucson for many years. Mr. Clapp was the vice-president of the Board of Directors of the Great Western Bank. Appellant was employed as a maintenance man at the Clapp residence and lived in a trailer on the premises with one Nellie Perez. Appellant's duties included general maintenance and gardening for which he received a paycheck every two weeks. On August 1, 1975, the Clapps went to Mexico for a vacation and took their checkbook which had been kept in a drawer in the desk in the living room with them. When the Clapps returned from Mexico on August 30, 1975, they found that appellant and Nellie Perez had departed. Appellant left a note which stated:

"My son has been hurt. I have sold my car. I will be back in four or five days. Tell Mrs. Clapp I told Nellie what she said and she left me."

On September 4, 1975, after the mail had arrived, Mr. Clapp started going through his cancelled checks. Within a few moments he came outside and said to Mrs. Clapp, "My God, Betty, Carlos has forged three checks on us almost to the amount of $5,000.00." There were three checks, dated August 6, 7 and 23, 1975, in the amounts of $976.63, $1,170.63 and $2,475.56, respectively. One check bore the notation "Patio wall and pump", another the notation "Wall and patio", and the third the notation "Well and patio wall".

Since Mr. Clapp died in October of 1975, the state relied on the testimony of Mrs. Clapp and an expert witness to prove that the purported signatures of Mr. Clapp were forgeries. The expert testified that these signatures had been traced and that each signature was identical, a circumstance which is impossible since a person cannot write his name exactly the same more than twice. Also, a pencil line appeared either under or over the signatures and the line quality of the ink signatures indicated that they had been drawn on the checks.

Mrs. Clapp also testified that the patio wall had been built long ago and that they had one well on the property which was there when they moved in but that a second well and pump was placed on the property by Ronstadt's.

A grocer, Johnnie Don, testified that he knew Mr. Clapp and knew that his checks were good. He stated that appellant often came into his store to cash paychecks and buy money orders. Appellant came into his store on August 7, 1975 and cashed the check for $1,170.63. When Mr. Don asked why the check was so large, appellant told him that he was a subcontractor for Mr. Clapp in the development of some housing projects in Nogales and Tucson. On August 23, 1975, appellant presented Mr. Don with a check for $2,475.56. He told Mr. Don the check was for some houses he had built for Mr. Clapp and that he was going

to use the money to pay for labor and material which he owed.

Frank Valenzuela, assistant manager of the Great Western Bank, testified at trial and at the hearing on a motion in limine made by appellant. The motion sought to exclude from evidence three "affidavits of forgery" executed by Walter Clapp on September 4, 1975 wherein Mr. Clapp stated that his signatures on the three checks were forgeries. These affidavits are routinely required by the bank if a person claims forgery and desires the bank to credit his account for the amounts paid. They are then kept by the bank for further investigation or are turned over to the police who require them prior to investigating any forgery. Appellant's motion was based on two grounds. First, that the affidavits were hearsay, and secondly, that their introduction into evidence denied appellant his right of confrontation under the United States and Arizona Constitutions. The motion in limine was denied. The trial judge, who was not the same judge who heard the motion in limine, declined to reconsider the ruling, and allowed the state to introduce the affidavits into evidence. Mr. Valenzuela also testified that the forged check dated August 6, 1975, was deposited to appellant's account at the Great Western Bank.

Nellie Perez testified that she had been living with appellant at the Clapp residence and was living with him in California when he was arrested for these offenses. She was employed as a cleaning woman by the Clapps and worked for them twice a week. She testified that in the latter part of July or early part of August she saw Mr. Clapp give Carlos five checks. Appellant showed her the checks. Two were paychecks and the other three were blank checks signed by Mr. Clapp. The record does not indicate when or where appellant showed her the checks. She stated that appellant hired three men to do some work on the premises after he received the checks but she did not see them do any work. She also said that appellant had replaced some bricks on the patio and patio wall and had replaced some gravel, however she did not remember when he did this work.

Appellant testified that he began working for Mr. Clapp because he had just been released from the Arizona State Prison and could not find a better job. According to appellant, approximately three days before he went on vacation Mr. Clapp told him of some work which he wanted done around the house while he and Mrs. Clapp were gone. Appellant stated that Mr. Clapp did not want Mrs. Clapp to know about the work because he did not want her interfering. It was to be kept a secret. He further stated that Mr. Clapp gave him three blank checks and told him to keep the expenses between $5,000 and $6,000. He was to put in a drain down to the well, replace a sewage line, run a water line from his trailer to the well, replace broken adobe bricks on the patio, clean and repair the roof, put gravel on the driveway and place a drain pipe across the driveway. Appellant also testified that he wrote the memos on the checks which indicated the purpose of each and filled in the amount of each check. He hired three men at the unemployment office who worked for him for three weeks and he used all the money from the checks to pay for their labor and for materials.

Appellant denied leaving the note prior to departure that Mrs. Clapp described. He denied depositing any money in his bank account from the check dated August 6, 1975 for the sum of $976.63, in spite of the fact that the account showed a deposit on the same date for $676.63. He stated that the entry in his account was an error.[1] Appellant also denied telling Mr. Don, the grocer, that the checks were given to him for subcontracting work on houses in Nogales and Tucson. He admitted that he did leave a note when he left but that it stated he was going to work for a Mr. and Mrs. Price in Oklahoma. Instead, he went to California to work at an apartment house which had been recommended to him by Mr. Clapp.

1. The record shows that appellant's account had a balance of 65¢ when the deposit was made and that he subsequently wrote checks on the account until it was overdrawn.

In rebuttal, Mrs. Clapp testified that no new gravel was put on the driveway, no new bricks were placed in the patio wall and that appellant had replaced some broken bricks on the back patio and in the fishpond but that was prior to their trip to Mexico.

■ The first question to be answered is whether the exclamation made by Mr. Clapp to his wife after opening his bank statement was admissible as an exception to the hearsay rule. Rule 803(2) of the Arizona Rules of Evidence states as an exception to the hearsay rule:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

The rule in Arizona is that the appellate court will not reverse the trial court's ruling under the excited utterance exception to the hearsay rule absent a clear abuse of discretion. *State v. Dale,* 113 Ariz. 212, 550 P.2d 83 (1976). The general principle of the exception is found in 6 Wigmore On Evidence (3rd Ed.) Sec. 1747:

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these conditions is an affray or an automobile accident. But the principle itself is a broad one." (footnote omitted)

■ While there was no affray or accident here, we believe the broad principle as recognized by Wigmore is operational under the facts of this case and the trial court did not abuse its discretion in admitting the evidence as an excited utterance.

Appellant next contends that the affidavits of forgery executed by Mr. Clapp were improperly admitted into evidence. The state claims that they were properly admitted under Rule 803(6). This rule states that the following are not excluded by the hearsay rule:

"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if:

(a) Made at or near the time of the underlying event,

(b) *by, or from information transmitted by, a person with first hand knowledge acquired in the course of a regularly conducted business activity,*

(c) made and kept entirely in the course of that regularly conducted business activity,

(d) pursuant to a regular practice of that business activity; and

(e) all of the above are shown by the testimony of the custodian or other qualified witness." (Emphasis added)

We do not believe that the affidavits meet the qualifications of subparagraph (6)(b). The rule requires that the person transmitting the information, in this case Mr. Clapp, have first-hand knowledge and that this first-hand knowledge must have been acquired in the course of a regularly conducted business activity. Mr. Clapp did not acquire his knowledge in the course of a regularly conducted business activity.

■ As an alternative to admissibility under the foregoing rule, the state contends that the affidavits were admissible as a hearsay exception under Rule 804(b)(5) of the Rules of Evidence. The hearsay exceptions under Rule 804 apply when the declarant is unavailable as a witness. Under the

rule, if the declarant is dead, he is unavailable. The part of the rule with which we are concerned states:

"A statement not specifically covered by any of the foregoing exceptions but *having equivalent circumstantial guarantees of trustworthiness,* if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant." (Emphasis added)

Since the foregoing rule is identical to Rule 804(b)(5) of the Federal Rules of Evidence the history and policy considerations surrounding the adoption of the federal rule are instructive.

The policy which prompted the adoption of the rule by Congress is found in Senate Report No. 93–1277, U.S.Code Cong. & Admin.News 1974, p. 7051, which can be found in Am.Jur.2d New Topic Service. Federal Rules of Evidence 191 (2nd Ed. 1975) at 208–210. The recognition of the principle that federal courts have discretion to admit hearsay evidence, where such evidence is found to be necessary and reliable, predates the adoption of the Federal Rules of Evidence. In criminal cases the court's discretion to admit "fundamentally reliable" hearsay despite the fact that such hearsay did not clearly fall within any of the established exceptions to the hearsay rule, has been recognized. *United States v. Kearney,* 136 U.S.App.D.C. 328, 420 F.2d 170 (1969). In Rules 803 and 804 of the Federal Rules of Evidence Congress intended to perpetuate this discretion by the inclusion of this "catch-all" clause or, as it is termed in the Senate Report, "residual hearsay exception." The rationale for the residual hearsay exception is found in the Report at p. 209:

"We disagree with the total rejection of a residual hearsay exception. . . . [W]e feel that, without a separate residual provision, the specifically enumerated exceptions could become tortured beyond any reasonable circumstances which they were intended to include (even if broadly construed). Moreover, these exceptions, while they reflect the most typical and well recognized exceptions to the hearsay rule, may not encompass every situation in which the reliability and appropriateness of a particular piece of hearsay evidence make clear that it should be heard and considered by the trier of fact.

The committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of prolativeness [sic] and necessity could properly be admissible.

\* \* \* \* \* \*

Therefore, the committee has adopted a residual exception for rules 803 and 804(b) of much narrower scope and applicability than the Supreme Court version. In order to qualify for admission, a hearsay statement not falling within one of the recognized exceptions would have to satisfy at least four conditions. First, it must have 'equivalent circumstantial guarantees of trustworthiness.' Second, it must be offered as evidence of a material fact. Third, the court must determine that the statement 'is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts.' This requirement is intended to insure that only statements which have a high probative value and necessity may qualify for admission under the residual

exceptions. Fourth, the court must determine that 'the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.'

It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. . . ."

The first thing we must decide is whether the affidavits of Mr. Clapp have "equivalent circumstantial guarantees of trustworthiness" to those of the hearsay exceptions set forth in Rule 804(b) of the Rules of Evidence. These exceptions are:

"(1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

(2) *Statement under belief of impending death.* In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

(4) *Statement of personal or family history.* (A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated; or (B) a statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared.

* * * "

Examining these exceptions vis-à-vis the "affidavit" of Mr. Clapp, we first note that although the document is termed an "affidavit", in truth and in fact it is not one. Mr. Clapp was not placed under oath and the document merely contains an acknowledgement before a notary public that Mr. Clapp executed the "affidavit".

■ What are the circumstantial guarantees of trustworthiness which form the bases of the exceptions of Rule 804, Rules of Evidence? The trustworthiness of the former testimony exception is based upon the opportunity to examine the declarant under oath.

■ The testimony under belief of impending death is admissible because of the supposed lack of motive to misstate and as such it is equivalent to a statement under oath. 5 Wigmore on Evidence (3rd Ed.) Sec. 1438; M. Udall, Arizona Law of Evidence, Sec. 176.

■ The admissibility of statements against the declarant's pecuniary or penal interest is founded upon the assumption that no one will not make a misstatement when to do so would hurt his pocketbook or subject him to criminal liability. *Deike v.*

*Great Atlantic and Pacific Tea Company,* 3 Ariz.App. 430, 415 P.2d 145 (1966).

█ Statements of personal or family history are admitted because of the probability that the "natural effusions" of those who talk over family affairs when no special reason for bias or passion exists are fairly trustworthy. 5 Wigmore on Evidence (3rd Ed.) Sec. 1482.

█ The "affidavits" of Mr. Clapp can be characterized as statements in *favor* of pecuniary interest and we do not believe they have an equivalent circumstantial guarantee of trustworthiness as do the other exceptions. Furthermore, they do not meet the requirement of subparagraph (b)(5)(B) of Rule 804 that they be more probative on the point for which they are offered than any other evidence which the proponent can procure through reasonable efforts. Mr. Clapp's statements that his signatures were forged is no more probative than the testimony of the expert witness. We conclude that the court erred in admitting these "affidavits" into evidence.

Was this error harmless under Art. 6, Sec. 27 of the Arizona Constitution? In order to answer this question we must first consider appellant's contention that admission of the "affidavits" denied him his right of confrontation under the Sixth Amendment to the United States Constitution. This is necessary since the state's burden is greater when the error is of constitutional magnitude, to-wit, the state has the burden of proving the error harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Hall,* 12 Ariz.App. 147, 468 P.2d 598 (1970).

Since appellant contends that the admission of Mr. Clapp's excited utterance to his wife also violated his right of confrontation, we shall commence with a discussion of particular testimony.

Three modern United States Supreme Court opinions have discussed the question of whether the admission of testimony under a hearsay exception violates one's right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution. In *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Court referred to its decisions which had approved the admission of hearsay:

"This Court has recognized the admissibility against an accused of dying declarations, *Mattox v. United States,* 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917, and of testimony of a deceased witness who has testified at a former trial, *Mattox v. United States,* 156 U.S. 237, 240–244, 15 S.Ct. 337, 338–340, 39 L.Ed. 409, See also *Dowdell v. United States, supra,* 221 U.S. [325], at 330, 31 S.Ct. [590], at 592; [55 L.Ed. 753]; *Kirby v. United States, supra,* 174 U.S. [47], at 61, 19 S.Ct. [574], at 579, [43 L.Ed. 890]. . . . There are other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses. . . . " 85 S.Ct. at 1069–1070.

In *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Court observed that the hearsay exception does not automatically violate the confrontation clause:

"Our task in this case is not to decide which of these positions, purely as a matter of the law of evidence, is the sounder. The issue before us is the considerably narrower one of whether a defendant's constitutional right 'to be confronted with the witnesses against him' is necessarily inconsistent with a State's decision to change its hearsay rules . . . . While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay excep-

tion. [citation omitted] The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." 90 S.Ct. at 1933–1934.

In *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) the Court was concerned with the extrajudicial statement of a co-conspirator which was admitted into evidence under a Georgia statute as a hearsay exception. The Court again declined to equate the confrontation clause with the hearsay exceptions. In holding that the defendant's right of confrontation had not been denied the *Dutton* Court stated, inter alia:

"[T]he circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant.

The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' [citation omitted]. Evans exercised, and exercised effectively, his right to confrontation on the factual question whether Shaw had actually heard Williams make the statement Shaw related. And the possibility that cross-examination of Williams could conceivably have shown the jury that the statement, though made, might have been unreliable was wholly unreal." [2] 91 S.Ct. at 219–220.

From the foregoing line of cases it is clear that the United States Supreme Court has refused to equate the Sixth Amendment confrontation clause and any particular version of the hearsay rule. A reading of *Dutton* does not give one any clear-cut formula for deciding whether or not the admission of evidence under the hearsay rule violates the confrontation clause. The most that can be gleaned from *Dutton* is the necessity of a case by case approach which takes into account the reliability of the testimony. The Ninth Circuit in *Shaffer v. Field,* 484 F.2d 1196 (9th Cir. 1973) considered the admissibility of a spontaneous exclamation and its relation to the confrontation clause. It held that there was no constitutional violation, stating:

"1. Admission of the spontaneous statements of the dying victim did not violate petitioner's Sixth Amendment right of confrontation. 'The determination of whether, in a particular case, the application of a recognized exception to the hearsay rule satisfies the requirements of the Confrontation Clause . . . calls for an examination of all the circumstances of the case. The relevant factual inquiry is whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration.' *United States v. Adams,* 446 F.2d 681, 683 (9th Cir. 1971). The trustworthiness of spontaneous statements is established on grounds distinct from the general credibility of the declarant. The declarant's unavailability did not deprive the jury of a basis for evaluating the truth of the declarations." 484 F.2d at 1197.

We conclude that appellant's right to confrontation was not denied by the admission of the excited utterance.

Assuming, but not deciding, that the admission of Mr. Clapp's "affidavits" violated the appellant's right to confrontation, we find the error harmless beyond a

---

2. For a discussion of these United States Supreme Court cases and the problem of the hearsay rule and the right to confrontation, see 5 Wigmore on Evidence (3rd Ed.) Sec. 1397.

doubt. The evidence against appellant was overwhelming and the error did not contribute to the verdict. *Chapman v. California, supra; United States v. Adams,* 446 F.2d 681 (9th Cir. 1971). The jury had the benefit of seeing the checks in question and hearing the testimony of the handwriting expert. We have also examined the checks. The forgeries of Mr. Clapp's signature were so clumsily done as to be comical. The pencil line of the tracing is clearly visible. In height, spacing and form, the signatures are identical, whereas the signatures on checks which were in fact signed by Mr. Clapp and admitted into evidence vary from check to check. Appellant presented no expert testimony to refute the testimony of the state's handwriting expert.

Coupled with the testimony of Mrs. Clapp as to the excited utterance made by Mr. Clapp, the evidence that the checks were forged is overwhelming.

■ The testimony of appellant was patently incredible. Furthermore, he testified that he did not want to go to prison because he became an informer during his prior stay and feared that he would be killed. His motive to prevaricate considered with the rest of the evidence demonstrates the error was harmless beyond a reasonable doubt. Denial of the right of confrontation can be harmless error and any statement to the contrary in *State v. Greer,* 27 Ariz.App. 197, 552 P.2d 1212 (1976) is specifically overruled.

■ Lastly, appellant contends the trial court erred in refusing to instruct the jury that in order for a check to be falsely made or altered it must be made or filled in without authorization. The issue in this case was not whether appellant was authorized to fill in the amounts on the check but whether the signature of Mr. Clapp was forged. The court gave a proper instruction on forgery to the jury and there was no error in refusing appellant's instruction.

Affirmed.

RICHMOND, C. J., and HATHAWAY, J., concur.