OPINION
BIRDSALL, Judge.
The principal question presented in this appeal is whether the trial court employed every feasible means to enable the appellant, who was removed from the courtroom at the beginning of the trial, to hear, observe or be informed of the further course of the trial and to consult with counsel in compliance with Rule 9.2(c) of the Arizona Rules of Criminal Procedure, 17 A.R.S. We hold that the trial court did adequately protect the appellant’s rights in this regard.
The appellant was charged and ultimately convicted of kidnapping and three counts of sexual assault. Although the decision of the trial court to remove him for disruptive and disorderly conduct is not questioned, he contends that the court violated the foregoing rule. He argues that more should have been done to enable him to participate in the trial short of returning him to the courtroom.
After 611 days in custody as a result of his arrest on the charges, a matter we address later in this opinion, the appellant’s trial commenced January 18, 1983. With the jury panel waiting outside, the court proceeded with some preliminary matters in open court with the appellant and his counsel present together with the prosecutrix. After eight interruptions by the appellant personally in the nature of short comments and questions, the following ensued:
“THE COURT: Mr. Starcevich, we are going to have to get something settled right now.
You are going to be quiet during this trial, except when you are on the witness stand, if you choose to testify. Otherwise, you are going to have to leave the courtroom.
Do you understand me?
DEFENDANT STARCEVICH: I beg your pardon, Your Honor?
THE COURT: Do you understand me, Mr. Starcevich?
DEFENDANT STARCEVICH: I understand the other day when I was here, I didn’t get a chance to hear the motions. I understand that, Your Honor.
THE COURT: Mr. Starcevich, do you understand that if you do not keep quiet, you will not be allowed to stay in the courtroom?
DEFENDANT STARCEVICH: And?
THE COURT: And the trial will proceed without you.
DEFENDANT STARCEVICH: And I will be convicted without being present?
THE COURT: If you choose to talk during court, yes, sir.
DEFENDANT STARCEVICH: Uh-uh. No.”
A brief discussion of requested voir dire questions including the names of prospective witnesses followed with no interruptions until the prosecutrix mentioned a name whereupon the appellant interjected:
“DEFENDANT STARCEVICH: Never heard of her. She must have been that junkie.”
The court and appellant then had the following exchange:
“THE COURT: Mr. Starcevich.
DEFENDANT STARCEVICH: Never
heard of her, though.
I’ll not be railroaded here. I don’t care who you are.
You didn’t give me an opportunity to hear the motions the other day.
THE COURT: Would you take the defendant out?
*380 DEFENDANT STARCEVICH: You tell them about Fred McNeill.
You get back punk. You don’t arrest me without no warrant, in the first place.
You don’t proceed without me. You know you can’t do this. You know what I mean.
I suggest you go in the back room and go through all those motions I presented.
I didn’t hear one motion presented, not one.
Would you please do me a favor, Mr. Emanuel, and bring up the fact of Mr. McNeill, after the A.B. trial, to look into my case?
MR. EMANUEL: (defense counsel) I will.
DEFENDANT STARCEVICH: Please bring that up.
MR. EMANUEL: I will.
DEFENDANT STARCEVICH: If he tries to convict me without that mandamus prohibition being first looked after, then I think you’re making a mistake.
You should at least wait for the Habeas Corpus motion to be handed down from the appeals court before you start deciding about the lower court decisions.
I’m a member of the Brethren. You don’t be pushing me around, punk.”
The appellant was then removed but before proceeding the court advised counsel:
“THE COURT: ... I’m going to ask the bailiff, when the bailiff returns, to get 33 jurors and we are going to proceed.
While that is going on, I suggest that you talk to your client and explain that I mean exactly what I say, that we are not going to have disruption in the courtroom.
If he wants to come back under those circumstances, he is welcome back.
But the first signs that he is not going to abide by those rules, he will again be removed.
MR. EMANUEL: I will talk to him in a little bit, Your Honor.
I did give him a written letter last evening, explaining all this to him and—
THE COURT: Perhaps, a copy of that may be filed with the record.
MR. EMANUEL: I have no problem with that, Your Honor.
THE COURT: You have made the representation that you have explained it to him. That is all that is necessary.”
The court then asked appellant’s trial counsel to go see the appellant and see what he wanted to do about returning and a recess was taken.
After the recess the following record was made:
“THE COURT: Before the jurors are called, there are some matters that need to be put on the record.
As Mr. Starcevich was leaving, going down the hall, I understand that he attempted to assault Detective Taylor and the deputy accompanying him.
And some force was needed to restrain Mr. Starcevich, which resulted in some injuries.
Do you want to expand on that?
MS. JORGENSON: (prosecutrix) Yes. Detective Taylor.
MR. TAYLOR: Would you like for me to, Your Honor?
THE COURT: Sure. That would be fine. Go ahead.
MR. TAYLOR: I went out to make sure that the detective got in the elevator okay with Mr. Starcevich. I anticipated a problem.
As he walked by, he became verbally abusive to me and started to run at me.
Detective Stanbrook subdued him. We both took him to the floor.
It appeared he had some kind of slight, small laceration behind his left ear.
He went down to the holding area with no trouble.
I returned his legal paperwork for him to the security area.
*381 THE COURT: All right. Under the provisions of Rule 902, a defendant who engages in disruptive or disorderly conduct, after having been warned by the Court that such conduct will result in his expulsion from a proceeding, shall forfeit his right to be present at that proceeding.
It is under that provision that I had Mr. Starcevich removed.
However, 9.2(B) provides: The Court shall grant any defendant so excluded reasonable opportunities to return to the court upon his personal assurance of good behavior. Any subsequent disruptive conduct on the part of the defendant may result in his exclusion without additional warning.
I understand that you talked with him, Mr. Emanuel, and told him that he could come back, on his assurance of good behavior, an assurance he is not yet prepared to make.
I understand, as well, from Detective Taylor and Detective Stanbrook that he may not presently be in a mental frame of mind, where he could abide by such an assurance.
Have I fairly stated the information that has been revealed to me?
MR. EMANUEL: Yes.
THE COURT: Very well. What I propose, then, to do is to proceed with jury selection this morning, to recess at the conclusion of selecting a jury, leaving opening statements and the giving of testimony for this afternoon.
I intend, before the jury returns, to have Mr. Starcevich brought to court, where I will again advise him of his right and the requirement of his assurance of good conduct as a condition of his remaining in the courtroom.
If he chooses to stay and abide by an assurance of not disrupting the processes of the court, then, of course, that will solve the problem, unless he again disrupts.
I am also taking steps to see if we can arrange to have video coverage of the testimony of witnesses, by moving to Judge Brown’s courtroom. And that requires some scurrying around at the lunchroom recess.
If we can, and arrange to have a security area where he can view the testimony, we will do so.
And I will recess at the conclusion of direct-examination of the alleged victim, so that Mr. Emanuel will have an opportunity to consult on proposed cross-examination with Mr. Starcevich.
MR. EMANUEL: I think that I’m going to have to have him in some way, either through the television or otherwise, on the jury selection process.
I think he has a right to assist counsel in the selection of the jury.
THE COURT: I think that’s right. I’ll tell you what. What we will do when we recess and you have to do your strikes, we can arrange for you to go consult with him.
MR. EMANUEL: He would have to—
THE COURT: You can furnish the information you have learned.
He has forfeited the right to be present at this proceeding. We will proceed.
And you may go review what you have learned about the prospective jurors and consult him with respect to the strikes you want to make.
MR. EMANUEL: If that is Your Honor’s ruling.
THE COURT: That is my ruling.”
The voir dire of the jury panel followed. After the trial jury was selected and sworn, the court recessed, directing the jurors to reconvene at 2 p.m. in courtroom 480 (Judge Brown’s). After the jurors left, the appellant’s counsel informed the court:
“MR. EMANUEL: ... The other matter is why the defendant has not come back into the courtroom.
I spoke to him on striking the jurors and selecting the jurors and had a great deal of trouble focusing him on that issue, and did not really receive anything from him in the way of any assistance in that regard.
He is concerned about his preoccupation with his allegation that Detective Taylor *382 assaulted him, injured his leg, as well as his neck; and that he will ultimately get justice; and that he is going to be railroaded, anyway.
And he does not see any reason why he should come in here.
I pleaded with him to come, because I believe that it is very important to his defense that he be here.
There were two deputies present when that happened. I reiterated that to him at least twice, probably three times.
And he says that he will get justice on his Petition for Habeas Corpus or before the Supreme Court from the United States Department of Justice, a theme that has been going through this case and the interviews with him at the jail for some time and from the past pleadings that he has filed.
So he is back onto that.
And he has said blanketly that he won’t come in. ‘You guys’ — was his statement— ‘railroaded me.’ That is his statement. And he is not coming.”
The court responded to this information:
“THE COURT: What I propose do to, Mr. Emanuel, is to ask the deputies to have him present in Courtroom 480, Judge Brown’s courtroom, at 1:30 today, where I will again advise him of his right to be present, on the assurance that he will be quiet while the proceedings progress.
If he chooses not to come, he will be taken to a holding area immediately adjacent to that courtroom, where I will go and personally address him and then return and put it on the record.
Should he still choose not to come to the courtroom, by promising not to disrupt the proceedings, he will be afforded, if our technology is as we think it is, an opportunity to view the trial on television.
And I assume — will the first witness be the alleged victim?
MS. JORGENSON: Yes, Your Honor.
THE COURT: The most important opportunity for him to consult with you, as to potential cross-examination, will occur at the end of direct-examination.
And we would take a brief recess for that purpose at that time.
If at any time during the course of the trial, you feel you need to — with other witnesses — consult with the defendant to adequately protect his interests, we will, of course, recess for that purpose.
Is that agreeable?
MR. EMANUEL: Yes, that is an agreeable method, under the circumstances, Your Honor.
He will be seeing it on television. I think that is fine.
THE COURT: Okay. Well, then we should reconvene at 1:30 in Judge Brown’s courtroom and proceed from there.”
However, the next reported proceedings were held in a holding cell in the Courts Building:
“DEFENDANT STARCEVICH: He
knows today was supposed to be a dismissal. This man is no idiot. He’s a judge. He’s an honorable judge. He knows today was dismissal time.
You’re not supposed to be playing all these games with me, Your Honor.
THE COURT: Mr. Starcevich, I have to advise you—
DEFENDANT STARCEVICH: Of my legal rights.
THE COURT: —that the trial is proceeding without you—
DEFENDANT STARCEVICH: Go ahead. Send me to the penitentiary.
THE COURT: —that the trial is proceeding without you.
DEFENDANT STARCEVICH: Here’s the blood. And I’m going to file on the guards as soon as I get back.
And I’m going to make sure that the motion gets into the Department of Justice of the Civil Rights Division of the Bureau of Prisons.
I have witnesses, at least three or four witnesses, down in the tank that saw those *383 guards physically manhandle me and throw me in here.
The bailiff saw them throw me on the floor.
I did not attack anybody.
THE COURT: Mr. Starcevich, I don’t have any jurisdiction over that.
DEFENDANT STARCEVICH: I’m sitting here with cuffs in this little cell.
THE COURT: Mr. Starcevich, I have to advise you that the trial is going to proceed without you, unless you promise me not to disrupt the proceedings.
DEFENDANT STARCEVICH: I didn’t disrupt.
THE COURT: Disruption is talking in court, Mr. Starcevich.
You may talk to your counsel quietly. Otherwise, you cannot speak in court.
DEFENDANT STARCEVICH: I’ve got a man in the back room, okay, from the newspaper. I got my cue from them. That is when it was time to go.
If you want to be pro-State, that’s okay.
THE COURT: I’m not trying to quarrel with you. I’m just trying to tell you that you can come back to the courtroom if you give me your assurance that you will be quiet and not disrupt the proceedings.
DEFENDANT STARCEVICH: I tried to tell you, Your Honor, that I am more than willing to wait a little extra time to get the appropriate counsel of my own choosing.
And you keep saying no, deny this, deny that. You denied everything in the book.
I have eyeballs. I sat and watched. I’m tired of my family, my people, my government. I’m sick and tired of every time I go in that courtroom, hearing through the rubbish grapevine, I’m going to be released. And I’m never released.
THE COURT: Well—
DEFENDANT STARCEVICH: As soon as I get back to the jail, I’m sorry, Your Honor, I’m going to be calling back east again in your name. I know they’re all true. I have to send your name in.
I know who is now presiding on the case.
Here I am, with courtroom cuffs on. You tie me down like a damn piece of meat in the courtroom.
I can’t relax. I can’t think about my case. I can’t look around the courtroom without being interrupted by you.
It’s okay if she says something. It’s okay if she presents a motion. It’s okay.
Yes, you can go ahead and prosecute his defense witnesses over here, if you’d like, Ms. Kelly or Ms. Jorgenson, whatever her name is.
I thought it was Star one time.
THE COURT: Mr. Starcevich, I don’t have time. We have a jury trial proceeding.
DEFENDANT STARCEVICH: If you think that you have got the right to convict me while I’m stuck over here in the cage with handcuffs on, while guards come over here .and manhandle me and beat me up—
THE COURT: Are you going to give me your assurance you are not going to disrupt?
DEFENDANT STARCEVICH: I have told my counsel what to do. I told him to disqualify you. I told him to do that already.
He’s not following — he’s not going around—
THE COURT: He has raised the matter. There is no cause for my disqualification.
Automatic disqualification has already taken place in this case.
DEFENDANT STARCEVICH: But—
THE COURT: I’m not sitting here to debate. I’m sitting here to find out whether you want to participate in these proceedings.
I’m giving you three options. You can go back to the jail, if you want to.
DEFENDANT STARCEVICH: I’m going to go back. I’ll be on the telephone.
I’ve given you three cards of three attorneys that are looking into my ease.
THE COURT: All right. Fine.”
*384 This ended the proceedings at the holding cell. Back in the courtroom the trial judge explained on the record that the other choices he was going to offer the appellant before he chose to return to jail were that he could return to the courtroom or he could watch the proceedings on television. The judge also explained that the appellant told the guards he would not return to court without force and the guards indicated they were reluctant to use force and perhaps hurt him. The trial then continued through the first day.
At the noon recess on the next day a telephone conversation between the court and appellant was recorded:
“THE COURT: Mr. Starcevich—
DEFENDANT STARCEVICH: Your Honor, Mr. Livermore, how’s everything with you?
THE COURT: Well, it’s going along.
Let me tell you something first, if I could.
DEFENDANT STARCEVICH: Okay. I won’t interject.
THE COURT: I tried to tell you yesterday, and I want to say it again — you are welcome to come back to court, if you will promise not to say anything, unless you want to take the witness stand.
Second, if you don’t want to do that, you can come over and watch it on television.
And, third, if you don’t want to come, you don’t have to come.
But I want you to know that you are welcome to come back, under those circumstances.
DEFENDANT STARCEVICH: Okay. May I respond in an appropriate, honorable fashion?
THE COURT: Sure.
DEFENDANT STARCEVICH: I have a grievance form right here I made out.
I had cuffs on. I didn’t make any swings or nothing. I don’t know why he was standing there.
I haven’t seen the doctor since I have been back over this.
You’ve seen the blood that was on my sweatshirt.
THE COURT: Mr. Emmanuel showed me the gauze pad.
DEFENDANT STARCEVICH: I was up in the holding tank with cuffs on, cuffs on in the holding tank.
All the time, Your Honor, all the time I’ve been locked up in this jail — and it goes back more than just this time — I’ve been locked up before — I’ve never, not once in my whole life assaulted a police officer.
And they’ve beat me up left and right, with my FCC license. And I have some other credentials I can’t discuss.
It is under the License Security Act I can’t discuss it with you.
I’ve never, not once, assaulted a police officer.
And I have the right to defend myself appropriately because of my license and some other credentials that are under the National Security Council, F-391. It might sound crazy, but it’s very true.
Moreover, we can’t find Mr. Manual Trujillo, who is referred to me by Mr. Cochise at the Forest Center in Willcox, Arizona.
Besides that, his Ford car, or pickup, or van, or whatever has a big, old kangaroo right on the side.
The guy I worked for for three or four days — I was on the Federal payroll. I don't take any other money, except for a job here or there.
They pay me the lowest amount of wage. I do not take any illicit money, just payroll, and that’s it.
THE COURT: Mr. Starcevich, I understand your problem. I cannot solve either of those problems.
You should, if you feel you should, file a complaint against the deputies. And you’ve done that already.
DEFENDANT STARCEVICH: A grievance is all.
THE COURT: I have to advise you of your right to be present in court.
*385 And I’m going to put Mr. Emanuel back on, so that you can talk to him about.
DEFENDANT STARCEVICH: Okay. Thirdly, I don’t want to make no real serious moves until I hear back from the U.S. District Court.
The clerk’s name is Georgia Madden.
I don’t understand why my restraining order isn’t being enforced.
THE COURT: I understand that, Mr. Starcevich.
DEFENDANT STARCEVICH: The Supreme Court in Phoenix — I haven’t heard back from them yet, nor have I heard back from the Secretary of State in reference to my diplomatic immunity.
THE COURT: I’m going to have to interrupt here and tell you that I cannot counsel you. That is Mr. Emanuel’s role. And I’m going to put him on right now.”
The telephone call involving the court and appellant ended at that time.
Later that day the following record was also made:
“THE COURT: ... We have, however, to put on the record what is not on the record, respecting our conversations with the defendant and his right to return to the trial, either on his assurance of not further disrupting the proceedings; or to view by television; or, if he wished, to remain at the jail.
I talked to him during the noon recess. And that conversation is on the record.
I understand that Mr. Emanuel tried to persuade him to come to testify.
And, perhaps, you would like to put on the record whatever you wish.
MR. EMANUEL: Yes, Your Honor. As yesterday, I pleaded with the defendant that he come to this trial, that I need him here.
And, specifically, I told him today — he knew it was an insanity defense.
And he, on constant prodding, refuses to answer directly, putting other questions back to me about other unrelated matters, and then refusing to accept my advice, that he should be here.
And I don’t think there is any question but that his decision to stay there, as well as he is to make it, mentally, if at all, assuming that there is a decision — and his decision is not to come here.
THE COURT: Very well. I believe you did ask him to testify. And he simply has decided not to come; is that right?
MR. EMANUEL: Yes. I believe he should testify and he should be here.
THE COURT: I heard you inform him of that.
MR. EMANUEL: Yes. He, apparently, had decided that he will not come.
THE COURT: All right
The presentation of evidence was concluded that day, the closing arguments made, the jury instructed and the case submitted. The next day the jury returned its verdicts. After the jury was dismissed the following ensued:
“THE COURT: ... Mr. Emanuel, I understand that the defendant came to the courthouse from the Pima County Jail today, but did not evince any interest in participating in the proceedings.
You asked him specifically if he wanted to come, and he simply would not answer.
MR. EMANUEL: Yes, Your Honor. That is essentially correct.
I went back, told the defendant that there had been a verdict returned on his case, and did he want to come into the courtroom for the jury’s verdict?
And his answer to me was: Number one, he was laying on the wooden sort-of-like bunk there — ‘I need some toilet paper.’
His pants were half down. ‘They didn’t give me any toilet paper.’
The second time, ‘I’ll get you the toilet paper. Do you want to come over after you get that taken care of?’
‘What do you mean, verdict?’
‘There was a trial.’
‘Well, you mean, there was a trial?’
*386 ‘Yes.’
T told the judge I had to go to the doctor yesterday.’
And I said, ‘Well, you knew the trial went on. Do you want to come in for the verdict?’
More things about: Well, I said I couldn’t be here.
Apparently, he is under the impression that he has control over events and with regard to the court.
And he is under some kind of misapprehension about that.
I never got a direct answer.
But I assume that his not answering the direct, explicit question like that put two or three times was a refusal to come into the courtroom.
THE COURT: Very well ....”
On February 17 the appellant was present in custody at sentencing, addressed the court without problems and gave the court some written materials. The court had ordered a competency re-evaluation for sentencing and found the appellant competent to proceed with that phase of the proceedings.
We have set forth all of the record concerning the trial court’s efforts to comply with the requirements of Rule 9.2(c) because we find that the best way to support our conclusion that every feasible means was employed. At all times the appellant was given the right to return to the courtroom upon his promise to behave appropriately. He was also given the opportunity to view the trial on television. His trial counsel was given opportunities to talk to him at appropriate times and did so. The record speaks for itself. Faced with a most difficult, trying situation, Judge Livermore did all that was required of him and more. See the leading U.S. Supreme Court decision, Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) and the decisions from our own state, State v. Jones, 26 Ariz.App. 68, 546 P.2d 45 (1976); State v. Delvecchio, 110 Ariz. 396, 519 P.2d 1137 (1974).
Because the record discloses remarks by the appellant which appear to be most inappropriate, we also observe that the appellant was found to be competent following not only one but several Rule 11 (Rules of Criminal Procedure, 17 A.R.S.) proceedings. In 1982 the appellant underwent evaluation and treatment and was found competent, as he had been on two prior occasions. This last determination was made in September 1982. Most of the excluded time under the Arizona Rule 8 “speedy trial” provisions resulted from Rule 11 proceedings and related waiting periods.
The other issues presented on appeal require some explanation of the evidence of the crimes. On May 15, 1981, the victim, a 20-year-old girl, accepted a ride to Tucson with appellant. The victim had been hitchhiking across the southwestern United States, with all her possessions in a large backpack. Upon arriving in Tucson, appellant made four or five stops in town. Appellant told her that he had some business to take care of in Tucson the next morning, and then he would be going on to Jerome, Arizona. Since he understood that she intended to hitchhike to Prescott, he offered to take her to Prescott the next day if she wanted to wait and go with him. Subsequently the appellant stopped his van in a parking area, and sometime thereafter made sexual advances toward her. When the victim refused, appellant grabbed her by the hair and began beating her head against the wall of the van. The victim fought appellant off, struggling to get free. When she eventually managed to kick the van doors open and get out of the van, appellant came running after .her. The appellant then told her that if she would just calm down he would take her wherever she wanted to go. The victim then got back in the van with appellant, believing that he was going to give her a ride to the interstate highway on the northwest side of Tucson.
Appellant began to drive away from the city. She told the jury that she was unsure of the direction, but saw a sign indicating *387 the way to Old Tucson. They passed Old Tucson a few miles later and then continued on, out into the desert. As they drove, .appellant began to threaten the victim with a walking stick, and she opened the van door as if to jump out. As the van slowed because of a blockade in the road ahead, the victim did jump out and took off across the desert. Appellant followed on foot. Hearing appellant close behind her, the victim abruptly stopped, causing appellant to flip over the top of her, and knocking her down. As she tried to get her breath back, appellant exposed himself to the victim, indicating that he wanted to perform an act of fellatio. The victim consented because she did not want “to die alone in the desert.” Appellant then walked her back to the van, but the engine would not start. Appellant laid out $15 or $20. Appellant told her to take what she wanted. She took $10 rather than run the risk that her refusal would make appellant angry. Appellant then told her that they were going “to have to wait it out the night.” The appellant then forced the victim to perform another act of fellatio and submit to sexual intercourse. She did not physically resist these additional sexual acts because she believed she was in danger of being killed. As long as she was submissive and didn’t argue, appellant remained calm. The appellant then drove to Robles Junction to get a tire fixed. While at the station, the victim went to the bathroom and tried to clean the dried blood off her face. She did not report the rape to the people at the gas station because she was afraid that appellant would panic and drive off taking everything she owned, including her money, clothes, and books. The appellant eventually left her along the interstate on the north side of Tucson.
Upon reaching a telephone, she first tried to call her parents but was unable to reach them. She then called the Rape Crisis Center and then went into a cafe to wait for the Crisis Center people to arrive. While she was waiting, she told the waitress that she had been raped. The waitress described the victim as completely “broken”. The waitress testified that she had tears running down her face, and her face and mouth were swollen.
Semen was found in the crotch of the victim’s panties and on her sweater, as well as on the bedding removed from appellant’s van. In addition, hair found in appellant’s bedding was microscopicly indistinguishable from her hair, and had been forcibly removed. Forcibly removed hair, matching the victim’s was also found in a braided leather bracelet appellant was wearing at the time of his arrest.
Appellant’s defense was insanity. One psychiatrist testified for him. Two other mental health experts disagreed with his diagnosis of appellant’s mental status at the time of the crime. One felt that appellant was possibly malingering.
In addition to his removal from the trial the appellant contends that:
1) Hearsay testimony of the waitress should not have been admitted.
2) The jury heard evidence of other unrelated criminal conduct.
3) The appellant was not tried within the Rule 8 time limits and his trial counsel was ineffective in failing to move for dismissal on that basis.

Hearsay

The waitress testified that the victim told her she had been raped. This was about 9 o’clock the morning after she had spent the night with the appellant in the desert. The last sexual assault had occurred about midnight to 1 a.m. The statement was admitted as an excited utterance exception to the hearsay rule. See Rule 803(2), Rules of Evidence, 17A A.R.S. The appellant contends that was too long an interval from the rape and thus the victim had time to fabricate. We disagree. The Arizona Supreme court has said:
“Lapse of time is only one factor to be considered. If the totality of the circumstances indicate that the statement was made in a state of shock or his demeanor and actions had been altered, it is admis *388 sible even though not made immediately after the event.”
State v. Barnes, 124 Ariz. 586, 589-90, 606 P.2d 802 (1980).
The victim had been held some 24 hours against her will during which time she was in fear of her life. She thought the appellant was violent enough to kill her. Attempts to escape had proven futile. The waitress testified that she was “completely broken”. Her mouth was so swollen and scratched she couldn’t even eat her soup. Under these circumstances the trial court could properly conclude she was in such a state of shock that her statement was admissible. Absent a clear abuse of discretion we will not fault the trial court’s ruling admitting an excited utterance. State v. Hughes, 120 Ariz. 120, 584 P.2d 584 (App.1978); State v. Dale, 113 Ariz. 212, 550 P.2d 83 (1976). We find no such abuse here.

Unrelated Criminal Conduct

During the direct examination of the victim, the following exchange occurred:
“Q. Now, did he stop at a couple locations and talk to people that he apparently knew?
A. Yes. About the third place we stopped was a bar-kind-of-place. And he stopped in the street.
And there were a lot of people out.
And he was trying to make a drug deal with them, basically; asked them what kind of drugs they had. Said acid and—
MR. EMMANUEL: Objection. Move to strike.
THE COURT: Sustained.
The jury will disregard the answer.” The fact that the jury heard the answer did not constitute a ground for a mistrial or reversible error for at least two reasons. First, the prompt ruling and admonition from the trial court. See United States v. Berry, 627 F.2d 193 (9th Cir.1980), U.S. cert. denied, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981). Second, the evidence, if it had been admitted, would have come within the exception allowing evidence of circumstances which complete the story of the crime. State v. Reinhold, 123 Ariz. 50, 597 P.2d 532 (1979). Evidence that the appellant was attempting to make drug deals adds some weight to the victim’s fear of the appellant.

Speedy Trial

Finally we turn to the length of time which expired from the appellant’s arrest, initial appearance and arraignment and trial. The parties agree that the rule required that the trial commence within 90 days from his arraignment. He actually went to trial 594 days after arraignment. The appellant, in his opening brief, summarily, without explanation, contends only 445 days were excludable under Rule 8.4. The appellee has given us a “time table” clearly demonstrating that at least 529 days were excludable. In his reply brief the appellant argues that the time involved in Rule 11 proceedings resulting from the state’s motion to have the appellant’s competency determined is not excludable. Even though the appellee has had no opportunity to respond to this argument, we believe it presents an issue which should be addressed.
The appellant is wrong. Rule 8.4(a) provides that “Delays occasioned by or on behalf of the defendant, including, but not limited to, delays caused by an examination and hearsay to determine competency, ...” are excludable from the computation of the time limits set forth in Rules 8.2 and 8.3. We find it significant that the rule does not limit the exclusion to competency proceedings resulting only from a defendant’s motion. Rule 11.2 provides that any party may move for an examination to determine whether a defendant is competent to stand trial. The comment to that rule explains:
“... The state must have the right to request an examination to determine competency, since the U.S. Supreme Court has held that the failure to make a determination of competency when reasonable grounds appear is fundamental constitutional error. Pate v. Robinson, *389 86 S.Ct. 836, 383 U.S. 375, 15 L.Ed.2d 815 (1966). Drope v. Missouri, 95 S.Ct. 896 [420 U.S. 162, 43 L.Ed.2d 103] (U.S.S.C. No. 73-6038 decided February 19, 1975)....”
Although we find no Arizona decision in which it appears that a Rule 11 motion was filed by the state and a question concerning whether that resulted in excludable time was considered, several opinions contain the statement that the entire period of delay caused by a mental examination and hearing to determine competency of a defendant to stand trial are excludable from speedy trial time computation. See Berger v. Rozar, 112 Ariz. 62, 537 P.2d 932 (1975), appeal after remand as State v. Jones, 113 Ariz. 567, 558 P.2d 912 (1976); State v. Landrum, 112 Ariz. 555, 544 P.2d 664 (1976). We hold that delay occasioned by the state’s Rule 11 motion is a delay occasioned on behalf of a defendant and is excludable under Rule 8.4(a). A defendant who is not competent cannot be tried. The defendant, prosecution and the court all have a duty to see that this does not occur. See McWilliams v. Justice Court, Tucson Precinct No. 1, Pima County, 5 Ariz.App. 200, 424 P.2d 848 (1967). The proceedings are clearly on behalf of the defendant regardless of who initiates the proceeding.
The excludable time involved for these proceedings was at least 86 days according to the appellant’s own calculations. Adding 86 days to the 445 days acknowledged to be excludable produces 531 excludable days. Thus the appellant was brought to trial in at least 63 days from arraignment and there was no Rule 8 violation. We reject the appellant’s contention of ineffective assistance of counsel since the only ground presented is an alleged failure to raise the nonexistent Rule 8 violation.
Affirmed.
HOWARD, C.J., and HATHAWAY, J., concur.